May it please the court, Donald Lancaster on behalf of Marcus R. Roberts. I invite the court's attention to the district court's ruling granting summary judgment against my client for his Eighth Amendment claims on the basis of qualified immunity and Eighth Amendment claims. The first prong that's required, the objective element requires that deprivation be objectively and sufficiently serious. The district court goes through assiduously the record and suggests that my client was denied, properly denied exercise on the basis of being an African-American and African-Americans were excluded from out-of-sale exercises because of disciplinary reasons, or that the entire institution was locked down. But there are two important documents here. There's the daily activity log and the program status report. And when you look at those documents, it's clear that my client was denied out-of-sale exercise in excess of, or excuse me, less than five hours per week. There are two cases that, or I'm sorry, one case and one regulation that applies to the minimum standard of out-of-sale exercise. Title 15, section 1065, that requires a minimum of three hours over a seven-day period. And Adler v. Sullivan that found that two to five hours was insufficient, suggesting that in excess of five hours per week is required. Here, my client buying through counsel employed a formula, because the district court said there was no mathematical evidence to suggest that my client was denied out-of-sale exercise. We looked at the total number of hours, excuse me, the total hours per week, the average hours of out-of-sale exercise, and we divided that by the number of days in the week to come up with the total hours of in-sale incarceration without exercise. Let me ask you this. Let's assume that there's an entirely justifiable lockdown of the prison. And as I read Judge Easey's very long, extraordinary long order, it appeared that at least some of those lockdowns were justifiable. Are you saying that you need an average over the entire relevant period of incarceration? Let's say he's there for, just to take an easy number, a year. Let's say that there's a justifiable lockdown for four months out of that year. You're saying that the average number of days of out-of-sale exercise has to be the entire year? Or do you say, well, let's look at the out-of-sale exercise that was allowed during the non-lockdown period? Well, certainly there are legitimate prison safety issues that must give way to the need for out-of-sale exercise. But I think that's where the district court errs. I think I didn't ask the question very precisely. Here's what I'm after. Let's assume, and I'll just give this to you as the assumption, and whether it's the real rule or not. Let's assume that there's a constitutional minimum that requires an average of five hours per week of out-of-sale exercise. And over the course of the year, four months were lockdown, justifiable lockdown. So we've only got eight months in which out-of-sale exercise was permitted. Does it comply with the constitutional requirement that during those eight months, five hours per week were allowed? Or because of the lockdown, are we required to give additional days so that we get the yearly average at five hours per week? Do you follow me? I do. I do. What's the answer? I think that's a very good question, Your Honor. I think if there was a constitutional requirement that my client is entitled to five hours of out-of-sale exercise, then I think that it should be increased during that eight months of non-lockdown time. And can you give us the 98 reasons for that answer? I'm sorry. Not to be flipped. How can that possibly be? Well, I think that — How could a reasonable prisoner administrator make up for four lost months of out-of-sale exercise time in eight months, consistent with prison safety and security, which you quite appropriately acknowledge? And what if it were six months? And what if it were ten months? Clearly, your answer would change, right? You wouldn't expect a yearly average to be achieved in only two or three months. So I'm asking, in follow-up to Judge Fletcher's question, how can it be achieved in eight months? Well, Your Honor — Why would that be the constitutional rule? This hypothetical presupposes that there's a constitutional right, and it's a hypothetical that isn't present here. Simply answering the question, I would think that there should be an effort, a good-faith effort on the part of the Department of Corrections to provide that additional time for out-of-sale exercise. That's just my response. I don't think anybody in this room would disagree with that, but we're talking about constitutional minima. I mean, this is a 1983 action. Absolutely. Okay. We're talking about this specific action when we look at the district court's ruling and the district court looking at specific times that the institution was so-called on lockdown. Well, not so called. It was on lockdown. No. And I think that's why it's important to invite the Court's attention to the daily activity laws in the program status reports. It says the institution was on lockdown. It wasn't on lockdown as it pertains or — I'm sorry. It says the institution was on lockdown as it pertains to Fresno Bulldogs, which is a Latino gang, not African-Americans. Can I ask a question about that? That's my problem with the case. My understanding of your client's briefing is that he's complaining there are times when he was subjected to a lockdown. He didn't get his yard time, even though his housing unit wasn't the discipline — the one being disciplined. If I can use that as a shorthand? Absolutely. All right. So — but I thought it sort of begged the question. I'm going to have the same question for your opposing counsel, because there was a question about even if it's a different housing unit that was the subject of a lockdown because it had a gang in it where there was a threat or a discovery of a weapon or something. There's a suggestion that it takes 30 minutes to search every cell. And so it seemed to me to be a suggestion, but I couldn't really tease it out of the briefing, that there was a reallocation of manpower, basically, to conduct that or to tend to that lockdown so that there was — that the other folks in the other housing units, including your client, weren't able to have their typical yard time. Is that a contention in this case? I think that's what the defendants would like to present. But there is case law that supports the notion that if one housing unit is locked down, that has nothing to do with the other housing units. Well, now, you said case law, counsel. What I'm talking about, do we have a factual record? Did you show? Was your client able to show that they could have let your guy have — your client have his yard time without any compromising of security just because there's a lockdown in some other part of the prison? That's what I'm concerned about. It's actually a factual question for me. Absolutely. And I think that my client at the trial court level suggested that it was available, because there are larger yards in which inmates are permitted to exercise, but then there are smaller yards that are next to each housing facility. And so in those particular instances, the correctional staff could have reorganized and provided each housing unit a small opportunity for exercise, out-of-cell exercise opportunities. Would you agree that that would be your client's burden to show that they could have done that and didn't? I think that my client — I agree that it is my client's burden. I do think that my client raised that issue at the trial court level. He was a pro se litigant at the time. And I think it's also important to just simply note that the Supreme Court has long held that inartful pleading by pro se litigants should be held to a lesser stringent standard. Sure. And I certainly grant you that. The problem I have is that we give a lot of deference to folks who are in charge of running prisons and trying to keep them safe. And my understanding is this particular prison, this particular facility had a lot of very serious safety problems, so that they went to this staggered schedule. They don't just open the doors and let everybody out at the same time. Right? And so that's why it's very hard for me to determine whether or not there really is the — was the ability to facilitate your — or permit your client to have his yard time when there were other lockdowns going on in other housing units. And I think, Your Honor — So where do I look for that? Where's your strongest showing in the record that they could have done that? I'm sorry, Your Honor. No, no. I think the strongest showing in the record is, A, the program status reports, and, B, the daily activity logs. Thank you. Because there are many instances in which the declarations given by the defendant directly contradict source documents. And I think that's important to note, that source documents, the daily activity log, the program status reports, clearly indicate when the institution was locked down, when my client received out-of-sale exercise, and what the status of the institution was. And there's a specific lockdown requirement procedure in notice that the facility didn't follow. I've reviewed those logs, and I just assure you that I have and I will again. But the problem I have is that I read them to say, you know, lockdown was necessary because housing unit 3 or housing unit involving a different gang, you know, had a security issue. What I need to do is try to close the gap to indicate why that didn't affect your client's yard time. I think the way to close that gap is to, again, look at that source material and say, could the correctional facility have made other accommodations, which they're duty-bound to do, to provide for out-of-sale exercise? And they could have. The correctional staff obviously has to provide security for inmates. If it requires overtime for additional staff to supervise inmates, then that's something that it has to do. And that shouldn't give way to my client's constitutional right to out-of-sale exercise. We've got a motion here to revoke IFP status that was made in this court. How do you respond to that motion? I respond to that motion shortly that that matter is not before the court. That matter wasn't appealed, and that matter isn't before the court. And so to raise this in ---- But we had a motion made here. Are you saying it was waived because not made earlier? I mean, what's the argument? I'm not sure you understand the argument yet. It was my understanding that it wasn't made here. Oh, okay. In this court. My client appealed the summary judgment ruling, and it's my understanding that's the only thing before the court at this time. And if I'm under a mistaken impression, which I may be, the other side can enlighten us differently. Absolutely. I reserve time unless there's any other questions. No, let's hear from the other side, and then you'll have a chance. Thank you. Good morning. May it please the Court, I'm Kathleen Borgers with the California Attorney General's Office, and I represent the appellees in this matter. As a preliminary matter, I did want to note that the issue of Mr. Williams' informal papyrus status remains outstanding. We did file in this court a motion to revoke his informal papyrus status. Did you file a motion in the district court to revoke it? I don't believe that we did. Why not? And if not, and if you didn't do it, why isn't it waived? I mean, why are you doing it for the first time here after we've had all this, you know, wait a minute. If he doesn't have IFP status, you could have said it earlier. You could have asked him to file the, you know, pay the money earlier. You put us in an awkward situation if we have to remand for a hearing to the district court on eligibility for IFP status. I mean, this is awkward. I understand. And the procedural history of IFP is that plaintiffs are required to make a specific showing for informal papyrus both at the district court and make a separate showing in the appellate court. There was a recent case, Williams v. Perano, that this Court decided in January that specifically found that, that not only do they have to make that showing, they have to make the imminent danger showing. So he, his strikes were not final until this appeal was filed. His case was filed in 2005. He didn't have three strikes. He was eligible for FP. He's not eligible for FP anymore. That is the jurisdictional issue that this panel needs to resolve prior to the merits. We filed the motion as soon as we could. It was referred to the merits panel. We did not request that. You know, that was the ---- Well, it's not a jurisdictional question. You didn't mean to say that. Well, I believe that that's how this Court treats it, that fee status must be resolved prior to turning to the merits. I don't think that this Court can properly rule on the merits of the appeal without resolving fee status. Now, however the panel wants to resolve that, you know, we don't have a say. But just for the Court's information, my understanding is that the panel does need to resolve the fee status issue. And again, I understand it is awkward. Everyone put a lot of time and effort into it. But we did file our motion to revoke FP very early in the appeal when it was referred to. Let me make sure I understand. I thought you said he legitimately had IFP status in the district court. Right. And he legitimately had IFP status when he filed his notice of appeal. No. He did not. No, because he had ---- And that is because of this case? No, because under the Prison Litigation Reform Act, if an inmate has three previous cases that have been dismissed as frivolous ---- There's a second case out there. There are three. There's two cases, one of which was dismissed for failure to state a claim. Okay. But I'm focusing on the time period. Right. What happened between his filing of this case in the district court and his filing of the notice of appeal in this Court? He litigated three other frivolous cases and received three strikes. And he's not in imminent danger right now. So he received three strikes during the pendency of this case. Right. But prior to the notice of appeal. Well, but if that's true, if it's prior to the notice of appeal, that means he actually lost his IFP status on your view of it while he was still in the district court. I'm not exactly sure of how the timing works, and I could go back and check right now and look at the dates or submit further briefing on it. But I'm not necessarily sure that we would be in a better position if while the summary judgment that defendants come in and say, oh, by the way, revoke your FP. And again, I think that the status partly has to do with, you know, when was it filed. He had FP when it was filed in 2005. I'm not even sure the case law would support the defendants trying to revoke it in district court while the district court case was pending. I think that the courts look at when the case was originated. The appeal is considered a separate case under the Prison Litigation Reform Act. I could turn to the merits of the appeal, although if you want to talk about it more, I could submit more evidence. But. Kagan. Could you answer my question that I asked earlier repeatedly about why is it that these logs, which I have read, which indicate that there was a disturbance in some other housing unit, should affect this individual's yard time? Yes. And I think I have – I did try to address it in our answering brief, but I think that there is partly – I don't think that there is evidence that plaintiff was kept from the yard because there were other units on lockdown. And one of the examples that plaintiff gives in his brief to support his claim that that happened was the March 2004 lockdowns. And if you look at excerpts of record 197 and 198, that's a program status report about that lockdown. And the way that these program status reports are, they are compiling all of the information about what's going on in Facility C. So if you have black inmates in C-5 lockdown and all bulldogs lockdown, they're both going to be in the same report. So if you look at this report, the way plaintiff read this report. But just to be clear, I understand that Unit C or whatever, that's eight different buildings. Exactly. And those individuals don't all get turned out in the yard at the same time. There's a staggered schedule so that certain folks are kept segregated from each other during yard time. Right? Right. Okay. So there's actually there's two yards. And so there's four buildings for lower yard and then four buildings, including Mr. Williams. Right. So understanding that, which I appreciate, then how do these logs help me if they just tell me there was a lockdown somewhere in Unit C? And sometimes, of course, tells me considerably more than that. It tells me it's not in his housing unit. So why does that affect his yard time? Well, it affects his yard time only because the lockdowns are the program's reports are relevant to show when Mr. Williams was locked down. The only lockdowns that affected him were when black inmates in C-7 were locked down. And sometimes it would be all inmates. And so if I could just show you on 198, that's excerpts of record, it says, on March 14, 2004, an anonymous note was found stating members of the black inmate population were planning an assault. So effective March 16, all members of the black inmate population have been placed on lockdown. This is the specific, so that is, this SAS report is specifically saying that in mid-March of 2004, Mr. Williams, as a black inmate, was locked down. This was used as an example from plaintiff's argument as to how the evidence didn't show that Mr. Williams was being locked down because the discussion also includes the discussion of the Bulldogs being locked down or some Southern Hispanics being locked down. But I've been back and through, and I know Your Honors have too. There is not an example of the defendants referring to a program status report to justify lockdown of Mr. Williams where that program status report did not affect Mr. Williams. And I think that there's other examples where it would specifically say, you know, inmates in C-7 or all, or who is affecting Hispanics, Northern Hispanics, Bulldogs in C-7. So what I think overall we're getting to here to look at the program status reports, the daily logs, I mean, this is a record that shows over a year and a half, while it was restrictive, Mr. Williams received yard time. He received constitutional yard time. The normal program that he was supposed to receive was two and a half hours of yard time, two days a week, so for five hours plus stay room. And I think the plaintiff even concedes that that is a constitutional program. And the question is just, to the extent he didn't get that, what were the justifications for that? And I think if you look through both the calendar that Defendant Captain Juan prepared, which is at 143, and then the record, you can see that really for each day that we're going through with yard, you've got lower yard down, mutual combat, cell searches. So I think that might speak a little bit to your question, and I think there was some of the confusion with plaintiff. So, for example, you have February 2nd, lower yard down, mutual combat, cell searches, so that's the day where Mr. Williams didn't get yard. No, that specific day is not going to be documented in the program status reports, because these were for serious lockdowns. These instead are documented in the daily logs, the control booth log that is showing what's happening on that day. And I don't think that there – I think that if you look at all of the cases, there just isn't justification for the kind of – Before you get to cases, sorry, just if I can finish that thought. So is it your position that you provided the constitutional minimum, he was provided the constitutional minimum, and that – except when he wasn't. And when he wasn't, when there was an interruption, you think that I'll be able to find, for every one of those times, a lockdown or a security incident in one or the others of these exhibits? Yes. Okay. Yes. And, again, what I would refer you to as the most helpful is the calendar that are in – that was submitted as part of Captain Wan's declaration. So is the area of confusion, then, there are instances where he points to – and I thought I had – but I will retrace my steps – found some instances where he was pointing to a particular day – we'll say it was, you know, Tuesday the 4th of April – that he didn't get yard time, and he was able to point to a lockdown that had to do with, you know, an unrelated housing unit. And your response, I think, is that if I look at the other exhibit, I should see something that justified lockdown in his unit. Exactly. And that was also – and I think that February is a good example. There were a couple incidents that is documented by the yard book where he didn't get yard. But, again, it's not documented by the program status reports because those really had to do with lockdowns that were multiple days and wasn't just, okay, in the morning there was a fight on the yard, so, you know, we couldn't send people out. Thank you. I think that the record amply demonstrates not only that the general program that was the ideal program of five hours of yard time plus the day room time was constitutional, but that also the temporary interruptions that the defendants imposed were reasonable. They were security – based on security concerns. They were narrowly tailored. There are several instances where, for example, white inmates attempted to murder another white inmate in Mr. Williams' housing unit. He was not locked down. There were black inmates who rioted in C6, the neighboring housing unit. Mr. Williams was not locked down during that time. The program status reports show that, for example, when some inmates in C2 were found with weapons and cell phones, there was an initial brief lockdown to do searches. Information was turned up that there were additional cell phones floating around, including in neighboring housing units of Mr. Williams. Then the lockdown was imposed. So the record really is demonstrating here that this was not a situation like we Thomas v. Ponder, where there was not really any justification given for what was going on, and that those deprivations were for extended periods of time and didn't necessarily have a specific termination. I mean, most of the lockdowns that you have here were two weeks, less than two weeks, even though the defendants put forward evidence that in order to really conduct a cell search of the whole area, it would take 15 to 20 days. You had multiple lockdowns where they conducted the cell search, and under that time, 14 days, 15 days. And I just don't see that plaintiff – and, again, plaintiff has the burden of establishing that there was no reasonable justification. And I would also like to point to the other –
judges: Davis, Fletcher, Christen